Jason Brooks, Pro per
636 Barberry Drive
Longmont, CO 80503
geniusjasonbrooks@gmail.com
(925)366-0803

FILED
CLERK, U.S. DISTRICT COURT
8/5/26
CENTRAL DISTRICT OF CALIFORNIA
BY CS DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JASON BROOKS,

Plaintiff,

v.

TIKTOK INC., a Delaware corporation, and TIKTOK USDS JOINT VENTURE LLC, a Delaware limited liability company,

Defendants.

Case No.: 26-cv-03405-MWF-RAO

**FIRST AMENDED COMPLAINT FOR:**
**(1) BREACH OF CONTRACT**
**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(3) CONVERSION**
**(4) UNJUST ENRICHMENT**
**(5) FRAUD BY OMISSION / CONCEALMENT**
**(6) MISREPRESENTATION AND FALSE ADVERTISING**
**(7) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (BUS. & PROF. CODE § 17200)**
**(8) DECLARATORY AND COMPENSATORY RELIEF — UNCONSCIONABILITY, ILLUSORY CONTRACT, AND ECONOMIC DURESS**
**(DEMAND FOR JURY TRIAL)**

### *I. Jurisdiction and Venue*

This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff Jason Brooks is a citizen of Colorado. Defendant TikTok Inc. is a Delaware corporation with its principal place of business in Culver City, California. Defendant TikTok USDS Joint Venture LLC is a Delaware limited liability company registered to do business in California. Plaintiff recognizes that, unlike a corporation, an LLC's citizenship for diversity purposes is determined by the citizenship of each of its members rather than its state of formation or principal place of business, and Plaintiff alleges that complete diversity exists between Plaintiff and each of TikTok USDS Joint Venture LLC's members. The amount in controversy exceeds $75,000, exclusive of interest and costs.

Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because Defendants maintain their principal places of business in this District, Defendants' Terms of Service require disputes to be filed in the federal courts of the Central District of California, and the substantial events giving rise to this action — including the decisions to terminate and demonetize Plaintiff's accounts and the ongoing manipulation of Plaintiff's Creator Rewards Program earnings — occurred or were directed from this District. TikTok USDS Joint Venture LLC's current Terms of Service, effective January 22, 2026, expressly provide that disputes "shall also be resolved exclusively" in this Court or the Superior Court of the State of California, County of Los Angeles, "regardless of whether the claim, cause of action, or dispute arose prior to your agreement to these Terms."

Plaintiff has suffered concrete and particularized injury-in-fact, including lost income, audience destruction, suppressed speech, reputational harm, and ongoing monetization suppression, directly traceable to Defendants' conduct and redressable by the relief sought herein.

### *II. Parties*

Plaintiff Jason Brooks is a private citizen and digital content creator residing in Longmont, Colorado. He is a United States citizen and has maintained multiple TikTok creator accounts through which he publishes political commentary, cultural analysis, life

updates, social criticism, and legal commentary and opinion to a substantial public audience. Plaintiff is an experienced pro se litigant who has litigated multiple federal civil actions across several jurisdictions. Plaintiff's TikTok content includes commentary analyzing and providing legal opinion on ongoing criminal and civil litigation matters of public interest, including the Karmelo Anthony trial, the Luigi Mangione prosecution, and related legal proceedings.

Defendant TikTok Inc. is a corporation incorporated under the laws of the State of Delaware with its United States headquarters and principal place of business at 5800 Bristol Parkway, Suite 100, Culver City, California 90230. At all times relevant to the conduct alleged in Sections III.A through III.G below — including the January and February 2025 terminations of @jasontbrooks and @jasontbrooks2, the September 2025 strike and demonetization of @jasontbrook4, and the March 22, 2026 RPM zeroing — TikTok Inc. was the sole owner, operator, and contracting party governing the TikTok platform in the United States, and the Terms of Service and Community Guidelines then in effect between TikTok Inc. and Plaintiff are the operative contract for that conduct. TikTok Inc. may be served through its registered agent for service of process: CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California.

Defendant TikTok USDS Joint Venture LLC is a limited liability company organized under the laws of the State of Delaware, registered to do business in California, with its principal place of business at 5800 Bristol Parkway, Suite 300, Culver City, California 90230. TikTok USDS Joint Venture LLC was formed on or about January 16, 2026, and assumed operation of the TikTok platform in the United States effective January 22, 2026, pursuant to a corporate restructuring in which TikTok Inc.'s United States operations were transferred to the new entity. TikTok USDS Joint Venture LLC's own Terms of Service, effective January 22, 2026, state that they "completely replace any prior terms of service between you and TikTok Inc." and that TikTok's "rights and obligations under these Terms are freely assignable by us without any requirement to notify you or any third party, in connection with a merger, acquisition, sale or disposition of assets, sale or

transfer of equity ... or by operation of law or otherwise." TikTok USDS Joint Venture LLC is the contracting party governing the TikTok platform for all conduct occurring on or after January 22, 2026, including the Bessent Video removal, the June 22, 2026 RPM zeroing, and the ongoing suppression of Plaintiff's Creator Rewards earnings, and is alleged in the alternative to be liable as the successor to and assignee of TikTok Inc.'s obligations for conduct predating January 22, 2026 to the extent TikTok Inc. is found not liable therefor. TikTok USDS Joint Venture LLC may be served through its registered agent for service of process: Corporation Service Company, which does business in California as CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California.

## *III. FACTUAL BACKGROUND*

### *A. Plaintiff's TikTok Creator History and the Pattern of Wrongful Enforcement*

Plaintiff Jason Brooks is a digital content creator who began publishing political commentary, cultural criticism, and social satire on TikTok without any commercial intent. Plaintiff did not initially seek to become a professional content creator; he was an ordinary private citizen whose authentic political expression organically attracted a substantial public audience.

Plaintiff operated account @jasontbrooks, which grew organically to approximately 19,000 followers through Plaintiff's authentic expression on political and social issues, including commentary critical of Republicans, the Trump Administration, the conflict in Gaza, and other matters of public concern like the prosecution of Luigi Mangione. Plaintiff did not solicit followers through paid promotion or artificial engagement; the audience accumulated through the genuine resonance of his content with viewers. Once Plaintiff observed that his content was generating substantial engagement and a growing audience, he made the decision to post more frequently and consistently, building his presence on the platform with the intention of continuing to grow his audience and participate in TikTok's Creator Rewards Program. At no point did Plaintiff's content on @jasontbrooks violate any provision of TikTok's Terms of Service, Community Guidelines, or any other stated policy

under any reasonable, good-faith interpretation of those policies. The reasonableness standard is the applicable measure — TikTok's contractual authority to take enforcement action against a creator's account extends only as far as a reasonable, good-faith application of its own stated policies would support. Plaintiff's content — lawful political commentary, social criticism, and cultural analysis — falls entirely within the categories of expression that TikTok's own guidelines expressly protect, and no reasonable application of any TikTok policy would support any enforcement action against it.

TikTok's promise to discipline accounts, remove content, or withhold Creator Rewards only upon an actual "violation" of its Terms of Service or Community Guidelines is illusory as a matter of California contract law. TikTok is simultaneously the sole author, sole enforcer, and sole and unreviewable interpreter of what constitutes a violation, with no functional appeal process and no external mechanism — judicial or otherwise — capable of independently testing any violation determination against the actual content. A promise conditioned on a standard that only the promisor may ever define, apply, or verify is not a real limitation on that party's discretion; it is unconstrained discretion dressed in the appearance of a rule. Each enforcement action alleged in this complaint was therefore not the exercise of an enforceable contractual right conditioned on an actual violation, but an unreviewable exercise of naked discretion under the guise of a compliance standard — a structure that is illusory and unconscionable under California Civil Code §§ 1550 and 1670.5, and that allows TikTok to engage in viewpoint-based suppression with impunity behind the appearance of neutral, rule-bound enforcement. As alleged more fully in Count VIII below, Plaintiff pleads in the alternative that no enforceable "violation" standard governs any of the conduct alleged herein; where this complaint nonetheless alleges that Plaintiff's content did not violate TikTok's stated policies under a reasonableness standard, that allegation is made in the further alternative, to preserve the claim in the event this Court finds the standard enforceable.

This illusory structure is not accidental, and TikTok's knowledge of it is central to the claims alleged in this complaint. Federal law, 47 U.S.C. § 230(c)(1), provides that no

interactive computer service "shall be treated as the publisher or speaker" of information provided by another, and courts have consistently construed this provision to bar virtually any claim — regardless of its legal label — that would require a court or jury to determine whether a platform's decision to remove, restrict, or demonetize a user's content was correct, pretextual, or motivated by the content's viewpoint, including claims where the underlying allegations of viewpoint discrimination were independently found plausible on the merits. This body of law is settled, well known to sophisticated platform operators and their counsel, and has governed TikTok's potential liability for content-moderation decisions throughout the period alleged in this complaint.

TikTok knows, and has known throughout the relevant period, that no creator, no jury, and no court can compel it to prove that any individual account termination, strike, demonetization, or content removal was actually based on an identifiable violation of its stated policies, because § 230(c)(1) immunizes TikTok from liability for that decision regardless of its actual basis. Notwithstanding this knowledge, TikTok has continuously represented to creators, to Congress, and to the public — including in sworn testimony and in its own briefing before the United States Supreme Court — that it is a neutral platform governed by objective content standards, that content is removed only for actual guideline violations, and that it "welcomes diverse perspectives." TikTok makes these representations knowing that the very legal doctrine that shields it from liability also ensures that no one can ever test whether they are true. This is not merely an absence of accountability; it is a structural incentive for TikTok to represent itself as neutral while reserving — and, as alleged throughout this complaint, exercising — unreviewable discretion to suppress specific viewpoints, secure in the knowledge that federal law forecloses any mechanism by which a creator could ever prove otherwise. Plaintiff does not ask this Court or any jury to determine, as a matter of content moderation, whether any specific item of Plaintiff's content did or did not violate TikTok's guidelines. Plaintiff asks this Court to recognize what follows as a matter of contract and fraud law from TikTok's own knowledge of its litigation shield: a standard that the promisor knows can never be

tested is not a real standard, and a representation of neutrality made with knowledge that it is permanently unfalsifiable is a knowing misrepresentation, as alleged more fully in Count VI (Misrepresentation Six) and Count VIII (Position Four) below.

In January 2025, TikTok Inc. wrongfully terminated @jasontbrooks without any legitimate basis, without providing Plaintiff with meaningful notice of any specific policy violation, and without providing any functional appeal process as required by TikTok Inc.'s own Terms of Service and Appeals Policy. As alleged more fully in Section III.E below, the Terms of Service actually in effect at the time of this termination — verified against the Internet Archive's contemporaneous snapshot of January 13, 2025 — authorized TikTok Inc. to disable a user's account only "if you have failed to comply with any of the provisions of these Terms, or if activities occur on your account which, in our sole discretion, would or might cause damage to or impair the Services or infringe or violate any third party rights, or violate any applicable laws or regulations." TikTok identified no specific provision of its Terms of Service or Community Guidelines that @jasontbrooks's content actually violated, and — as alleged above — the "violation" standard TikTok invokes is not a real, ascertainable contractual limitation capable of independent verification; it is illusory. The termination of @jasontbrooks was accordingly not authorized by any enforceable contract term, and TikTok's unexplained invocation of a "violation" as its basis is itself evidence of the unconstrained, unreviewable discretion this complaint alleges. In the further alternative, and to preserve the claim should this Court find the violation standard enforceable, Plaintiff alleges that no such violation existed under any reasonable application of TikTok's stated policies. Plaintiff's content on @jasontbrooks consisted entirely of lawful political commentary, social criticism, and cultural analysis — expression that no reasonable interpretation of TikTok's Terms of Service, Community Guidelines, or any other stated policy would prohibit. TikTok's own Community Guidelines expressly state that the platform "welcomes diverse perspectives" and is a place where "authentic content thrives." Commentary critical of the Republican Party, the Trump Administration, U.S. foreign policy, and matters of racial and social justice falls squarely

within the categories of expression TikTok's own guidelines purport to protect. The termination of @jasontbrooks was wrongful, pretextual, and in direct breach of TikTok Inc.'s own Terms of Service, Community Guidelines, and Appeals Policy. The termination instantly and irreversibly destroyed Plaintiff's entire accumulated audience of approximately 19,000 followers — an audience built through months of consistent creative investment — without compensation, without notice, and without any legitimate justification.

Following the termination of @jasontbrooks, Plaintiff attempted to rebuild his presence by creating @jasontbrooks2. Due to TikTok's failure to provide any forwarding mechanism, farewell capability, or audience notification when banning an account, Plaintiff was unable to inform his existing followers of the new account. Of his 19,000 prior followers, only approximately 700 — a recovery rate of approximately 3.7% — located and followed the new account, representing a permanent and irreversible audience destruction rate of approximately 96.3%. This 96.3% permanent and irrecoverable audience destruction rate is a direct and proximate consequence of TikTok's wrongful termination of @jasontbrooks. TikTok's platform architecture — which provides no forwarding mechanism, no farewell capability, and no audience notification when an account is terminated — ensures that wrongful terminations cause permanent, irreversible audience destruction. This architectural choice is not neutral: it maximizes the punitive impact of account terminations on creators while insulating TikTok from any obligation to remedy the harm caused by its wrongful enforcement actions.

In February 2025, TikTok Inc. wrongfully terminated @jasontbrooks2 — again identifying no specific provision of the Terms of Service that Plaintiff's content actually violated, without meaningful notice, and without any functional appeal process, in violation of the same January 2025 Terms of Service provision quoted above. As with the termination of @jasontbrooks, TikTok's unexplained invocation of a "violation" it never specified is not the exercise of an enforceable contractual right under an illusory standard nobody but TikTok can ever verify; it is further evidence of the same unconstrained

discretion. This was the second consecutive wrongful termination of a Plaintiff account within a period of approximately thirty days, targeting the same creator for the same category of lawful political expression on the same platform. The content was the same — lawful political commentary and social criticism. The creator was the same. The only consistent variable across both terminations was the viewpoint expressed: criticism of the Republican Party, the Trump Administration, U.S. foreign policy, and matters of racial and social justice. In the further alternative, Plaintiff alleges that no TikTok policy violation existed on @jasontbrooks2 any more than it existed on @jasontbrooks, and that two consecutive terminations of the same creator for the same lawful expression, within thirty days, under circumstances where no reasonable application of TikTok's stated policies would find a violation, establishes a pattern of viewpoint-based enforcement that cannot be explained by neutral application of TikTok's stated content policies. The terminations were pretextual. This second wrongful termination constitutes a second independent breach of TikTok Inc.'s Terms of Service, Community Guidelines, and Appeals Policy, and reduced Plaintiff's audience to zero followers, forcing him to restart entirely from scratch.

On February 19, 2025, Plaintiff sent a formal demand letter to TikTok requesting reinstatement of his accounts and providing notice of possible litigation. TikTok ignored this correspondence and refused to engage in informal resolution, in direct breach of the Terms of Service's mandatory pre-litigation dispute resolution process. TikTok's refusal to respond to or engage with Plaintiff's formal demand letter constitutes an additional breach of TikTok's Terms of Service, which require TikTok to provide creators with meaningful dispute resolution mechanisms. By ignoring Plaintiff's formal written demand entirely, TikTok denied Plaintiff the pre-litigation dispute resolution process its own Terms of Service require, forcing Plaintiff to resort to litigation to vindicate rights that TikTok's own contractual processes should have addressed.

Beginning February 26, 2025, Plaintiff created @jasontbrook4 starting from zero followers — receiving no audience migration from @jasontbrooks2 because the second consecutive ban had eliminated any realistic prospect of audience recovery. The 3.7%

recovery rate achieved between @jasontbrooks and @jasontbrooks2 was itself not achieved on the second restart; Plaintiff began with zero followers. The chilling effect of two consecutive, unexplained account terminations began at this moment and persisted through the period that followed, as Plaintiff understood that his continued political expression carried an ongoing risk of arbitrary and total account destruction. As a direct result of TikTok's two wrongful account terminations, Plaintiff entered the @jasontbrook4 rebuild period having already suffered: the permanent destruction of approximately 19,000 followers on @jasontbrooks; the irrecoverable loss of the audience migration potential those followers represented; and the economic harm of months of lost Creator Rewards earnings that would have accrued had @jasontbrooks and @jasontbrooks2 been permitted to continue operating without wrongful interference. These prior harms compound every subsequent harm alleged in this complaint — they represent the baseline damage from which Plaintiff was forced to rebuild, under the ongoing threat of further arbitrary enforcement, before TikTok's subsequent demonetization, strikes, RPM throttling, and account-wide zeroing caused additional layers of harm on top of an already-damaged foundation.

***B. The Demonetization Pattern on @jasontbrook4***

Plaintiff Plaintiff rebuilt @jasontbrook4 through persistent content creation. By August 2025, the account had grown to approximately 81,000 followers and was accepted into TikTok's Creator Rewards Program. In August 2025, Plaintiff earned $880 through the Creator Rewards Program, representing his first verified monetization on the rebuilt account. Plaintiff's acceptance into the Creator Rewards Program in August 2025 — and his immediate generation of $880 in verified earnings during his first month — demonstrates two things of legal significance: first, that Plaintiff's content was sufficiently compliant with TikTok's policies to qualify for the program, directly contradicting any suggestion that his prior account terminations were justified by legitimate policy concerns; and second, that Plaintiff had established a concrete, documented, and growing income

stream on the platform that TikTok's subsequent enforcement actions directly and proximately destroyed.

In approximately September 2025, TikTok Inc. issued a strike against @jasontbrook4 and immediately demonetized the account, citing alleged violations of its Community Guidelines including purported "hate speech," "hateful behavior," and "violent extremism." As alleged in Section III.A above, TikTok's invocation of these labels is not the exercise of an enforceable contractual right conditioned on a real, ascertainable violation — the "violation" standard is illusory, since only TikTok can ever define or verify what these labels mean or whether they apply. In the further alternative, these characterizations were factually baseless and pretextual and do not survive scrutiny under any reasonable, good-faith application of TikTok's stated policies. As alleged in Section III.E below, the Terms of Service in effect in September 2025 — verified against the Internet Archive's contemporaneous snapshot of September 2, 2025 — remained identical in all material respects to the January 2025 version, tying any account-level discipline to an actual violation, not to unlimited discretion. This was not the first time TikTok had taken baseless enforcement action against Plaintiff's accounts — it another iteration, following the wrongful terminations of @jasontbrooks and @jasontbrooks2 in January and February 2025. The pattern of pretextual enforcement targeting the same creator for the same category of lawful political expression, now for the third consecutive time, is not coincidence. The specific content flagged in September 2025 consisted entirely of lawful political commentary and social criticism that no reasonable, good-faith application of any TikTok policy would prohibit.

The specific content flagged by TikTok in the September 2025 enforcement action was a video in which Plaintiff, appearing on camera, played an audio statement by another person talking about the genocide in Gaza that said: "I have enough of a moral compass to say I'm against genocide. I'm against children starving whether they're white or brown, whether they're Christian or Muslim. I hate seeing children starve to death on purpose." TikTok issued a strike for "violent extremism" against this content. TikTok's

characterization is not subject to any independent test: the "violent extremism" label, like every other violation label TikTok invokes throughout this complaint, is defined and applied solely by TikTok, with no external mechanism by which Plaintiff or any factfinder could verify the label's accuracy — the standard is illusory, and its invocation here is accordingly not the exercise of any enforceable contractual right. In the further alternative, Plaintiff alleges that under no reasonable, good-faith application of TikTok's Community Guidelines — which define violent extremism as content that promotes, facilitates, or glorifies acts of terrorism or mass violence — does this content constitute violent extremism. The statement contains no threats, no incitement, no promotion of violence, and no glorification of any act of terrorism or mass violence. TikTok's characterization of this content as "violent extremism" is a pretextual label applied to suppress a specific political viewpoint. The strike constitutes a breach of TikTok Inc.'s Terms of Service, Community Guidelines, and the implied covenant of good faith and fair dealing.

Plaintiff promptly appealed the September 2025 strike through TikTok's in-app dispute system. As with every prior enforcement action taken against Plaintiff's accounts, the appeal was denied instantaneously — within seconds of submission — making it factually impossible that any meaningful human review occurred before any denial was issued. This is not an isolated procedural failure — it was a consistent pattern across every enforcement action TikTok has taken against Plaintiff's accounts. This consistent pattern of instantaneous denials demonstrates that TikTok's appeal process is not a genuine safeguard against wrongful enforcement but a systematic sham — engineered to create the appearance of due process while ensuring that no wrongful enforcement action against Plaintiff's accounts is ever actually reviewed, reversed, or remedied through TikTok's own processes. This constitutes a pattern of breach of TikTok's Appeals Policy and the implied covenant of good faith and fair dealing across every enforcement action alleged herein.

The September 2025 demonetization caused Plaintiff immediate and direct economic harm, eliminating Plaintiff's Creator Rewards income entirely. By September 2025, Plaintiff had already survived: the wrongful destruction of @jasontbrooks and its

19,000-follower audience; the wrongful destruction of @jasontbrooks2; and months of rebuilding from zero under the ongoing threat of further arbitrary enforcement.

As a result of the demonetization, @jasontbrook4's follower growth stalled almost entirely. The account remained at approximately 81,000 followers from August 2025 through January 20, 2026 — a period of approximately 173 days. As demonstrated below, once Plaintiff was re-accepted into the Creator Rewards Program and resumed unrestrained posting beginning January 20, 2026, his account grew at a demonstrated natural rate of approximately 896 followers per day across all unrestrained periods on this account. Applying that same demonstrated rate to the 173-day stagnation period yields an estimated follower deficit of approximately 154,808 followers that were never acquired during this suppression period, representing a conservative natural-growth comparator established by Plaintiff's own subsequent, unsuppressed performance on the same account.

TikTok's content moderation records reflect a pattern of enforcement that is consistent only with viewpoint-based discrimination rather than neutral application of content standards. Strikes and enforcement actions against @jasontbrook4 were issued against content expressing political viewpoints critical of the Republican Party, the Trump Administration, U.S. foreign policy, and matters of racial and social justice — viewpoints that no reasonable, good-faith application of any TikTok policy would prohibit. Meanwhile, creators publishing content supportive of the Republican Party, the Trump Administration, or U.S. foreign policy faced no comparable enforcement actions for content expressing equally strong political opinions from the opposite viewpoint. This differential enforcement — applying TikTok's content standards against one viewpoint while not applying them against the opposing viewpoint on comparable content — is the hallmark of viewpoint discrimination rather than neutral content moderation.

***C. Re-Monetization and the Second Demonetization***

By late March 2025, @jasontbrook4 had organically grown to approximately 10,000 followers and generated in excess of 100,000 views within a rolling 30-day period — satisfying both primary objective eligibility thresholds for TikTok's Creator Rewards

Program as stated in TikTok's own program terms. Despite meeting these thresholds, TikTok did not accept Plaintiff's account into the Creator Rewards Program until August 2025 — approximately four months later — without providing any explanation or stated basis for the delay. Plaintiff alleges on information and belief that this four-month exclusion was not the result of any objective eligibility deficiency, but rather reflects the same viewpoint-based discrimination that pervades Defendants' treatment of Plaintiff's account throughout the relevant period. During this four-month period, TikTok continued to collect advertising revenue on Plaintiff's content while paying Plaintiff nothing, despite Plaintiff having satisfied every stated eligibility condition. This four-month exclusion constitutes an additional breach of the implied covenant of good faith and fair dealing, an additional instance of unjust enrichment, and additional evidence of the viewpoint-based discrimination alleged throughout this complaint, resulting in estimated lost earnings of approximately $11,760 at fair-market RPM rates across Plaintiff's demonstrated audience during that period.

In August 2025, @jasontbrook4 was accepted into the Creator Rewards Program. Plaintiff earned $880 during his first month of monetization, demonstrating immediate and concrete income generation from his content. Plaintiff's acceptance into the Creator Rewards Program in August 2025 and his immediate generation of $880 in verified earnings constitutes a tacit admission by TikTok that Plaintiff's content was sufficiently compliant with TikTok's policies to qualify for monetization — directly undermining any suggestion that the prior terminations of @jasontbrooks and @jasontbrooks2, or the subsequent September 2025 demonetization, were justified by legitimate policy concerns.

Within weeks of being accepted into the Creator Rewards Program, TikTok initiated a third enforcement action against Plaintiff — issuing a strike and demonetizing @jasontbrook4 in approximately September 2025. The September 2025 demonetization is therefore not merely a breach of TikTok's Terms of Service and Community Guidelines in isolation — it is the continuation of a documented, escalating pattern of viewpoint-based

suppression that began with the wrongful termination of @jasontbrooks in January 2025 and has continued without interruption through the date of this filing.

On January 20, 2026, TikTok restored Plaintiff's monetization status without any stated basis, without any acknowledgment of error, and without any explanation of what changed between September 2025 and January 2026. No legitimate policy violation can justify a five-month demonetization that is then reversed without explanation. The silent restoration of monetization after five months confirms that the September 2025 demonetization was pretextual from the start.

Beginning January 20, 2026, @jasontbrook4 resumed organic growth. The account grew from approximately 81,000 followers on January 20, 2026, to approximately 130,000 followers by March 21, 2026 — a 60-day period yielding approximately 817 followers per day. Following the filing of this action on March 30, 2026, and through June 29, 2026, the account grew from approximately 130,000 followers to 224,400 followers — approximately 94,400 followers over 90 days yielding approximately 1,049 followers per day. The blended demonstrated natural growth rate across both unrestrained periods is approximately 896 followers per day — the conservative baseline rate used throughout this complaint for the damages and but-for follower calculations. Plaintiff earned approximately $2,048 in March 2026, $1,965.60 in April 2026, and $2,339 in May 2026 during this re-monetized period.

Plaintiff's Creator Rewards Program dashboard — generated and maintained by TikTok as its own business records — reveals a systematic and undisclosed monthly pattern of RPM manipulation that repeats identically across each month: RPM begins strong in the first week, reaches a monthly peak around days 4-9, then is progressively throttled downward throughout the remainder of the month, reaching near-zero by month end. This pattern is documented identically across April, May, and June 2026.

In April 2026, Plaintiff's RPM peaked at $2.22 on April 6, 2026. RPM then declined progressively throughout the month, falling to $0.23 on April 22 and reaching $0.00 by April 30. Plaintiff earned approximately $1,965.60 in April 2026.

In May 2026, Plaintiff's RPM reset to $1.17 on May 1, peaked at $1.70 on May 5, then declined progressively through the remainder of the month — $0.91 by May 19, $0.74 by May 25, $0.61 by May 28. Plaintiff earned approximately $2,339 in May 2026.

In June 2026, Plaintiff's RPM reset to $1.22 on June 1, peaked at $1.39 on June 4, then declined progressively — $0.96 on June 6, $0.52 on June 9, $0.33 on June 17, $0.09 on June 21 — before being zeroed completely on June 22, 2026, for the remainder of the month. Plaintiff earned $3,831.92 in June 2026 in total, of which approximately $3,500 was earned in the first 15 days before the throttle rendered earnings negligible. TikTok's own June 2026 Performance dashboard shows 5.4 million qualified views for the month at a blended RPM of $0.69, yielding $3,831.92 actual versus approximately $10,800 at fair-market $2.00 RPM — a single-month suppression gap of approximately $6,968.08 across all of Plaintiff's videos.

The monthly peak RPM itself is declining each month: April peak $2.22, May peak $1.70, June peak $1.39. This documents a long-term suppression trend layered on top of the monthly throttle cycle — each month's ceiling is lower than the prior month.

This decline is not incidental to Plaintiff's growth — it moves inversely to it, and the total monthly earnings data confirms the relationship directly. During the same period that Plaintiff's monthly peak RPM fell from $2.22 to $1.39, @jasontbrook4's audience grew substantially, from approximately 130,000 followers in late March 2026 to 224,400 followers by late June 2026. Plaintiff earned $3,831.92 in June 2026. Despite no reduction in audience size, posting frequency, or content quality, and despite the account's continued growth, Plaintiff earned only $1,468.60 in July 2026 — a decline of approximately 62% month over month. Plaintiff alleges on information and belief that TikTok's throttle mechanism operates, in whole or in part, to offset the increased earnings a growing creator would otherwise generate, such that the more views and followers a creator accumulates, the more aggressively TikTok suppresses the rate paid per view, irrespective of the creator's actual performance or growth trajectory. This mechanism effectively punishes creators for growing rather than rewarding them for it, and ensures that no creator's earnings scale in

proportion to the audience and engagement TikTok's own platform enabled that creator to build. Discovery of TikTok's internal RPM-calculation and earnings-cap systems will determine the precise mechanism, but the documented result — earnings that fall as audience and engagement rise — is consistent only with a suppression system calibrated to the creator's growth, not to the creator's conduct or content.

None of this monthly throttle mechanism is disclosed anywhere in TikTok's Creator Rewards Contract, Terms of Service, or any other document provided to creators. The advertising CPM rates TikTok charges advertisers do not decline proportionally to Plaintiff's RPM throughout the month — advertisers pay full rates regardless of what TikTok pays creators. TikTok retains the difference.

Plaintiff posted a video titled "Need some good ones #what #is #the #best #gadget" on March 23, 2026 — neutral, non-political consumer content — which accumulated 1.7 million views yet earned only $3.89 in total rewards at $0.00 RPM. At fair-market RPM of $2.00 per 1,000 views, this single video should have earned approximately $3,400. Instead Plaintiff earned $3.89 — a per-video suppression of $3,396.11. This is not a content-quality issue: the video is non-political consumer content that accumulated 1.7 million views demonstrating massive organic reach. The $0.00 RPM reflects the account-wide zeroing event of March 22, 2026, not any deficiency in the content itself.

The RPM zeroing and throttle mechanism operates as a financial coercion system targeting specific viewpoints. Plaintiff has experienced this coercive mechanism directly — the knowledge that posting political and social commentary generates $0.00 in compensation while the same platform collects full advertising revenue on that content creates a sustained direct, ongoing suppression of expressive activity.

***D. The March 22, June 22, and July 22 RPM Suppression Events***

But On March 22, 2026, TikTok zeroed Plaintiff's RPM to $0.00 across all videos on @jasontbrook4 with zero advance notice and no disclosed basis — the latest escalation in a continuous, documented pattern of viewpoint-based suppression that began with the wrongful termination of @jasontbrooks in January 2025. Multiple videos posted on and

after March 22, 2026, show $0.00 Total Rewards and $0.00 RPM in TikTok's own Creator Rewards Program dashboard — including the gadget video which accumulated 1.7 million views and earned $3.89 despite being entirely non-political consumer content, demonstrating that the zeroing was account-wide and indiscriminate, not content-specific.

The March 22, 2026, zeroing was implemented with zero advance notice, in direct violation of TikTok's own Creator Rewards Contract, which expressly requires "reasonable advance notice" before modifying or ceasing creator rewards. No notice of any kind was provided to Plaintiff before or after the March 22 zeroing event. This failure to provide reasonable advance notice before the March 22 zeroing is consistent with TikTok's conduct throughout every enforcement action alleged in this complaint.

The nine-day period of complete RPM zeroing — from March 22 through March 30, 2026 — eliminated Plaintiff's Creator Rewards earnings entirely during a period when Plaintiff's account was generating substantial qualified views and audience engagement. At Plaintiff's demonstrated fair-market earning rate of approximately $233/day, the nine-day zeroing caused direct earnings losses of approximately $2,097.

On March 25, 2026, Plaintiff filed the original Complaint in this action, during the ninth-day zeroing period. RPM zeroing continued for five additional days after filing, through March 30, 2026, before RPM was restored to $1.41 on April 1, 2026 — a restoration in direct temporal proximity to the filing of this litigation.

On June 22, 2026 — the identical calendar date as the first zeroing event, occurring exactly three months later — TikTok again zeroed Plaintiff's RPM to $0.00 across all videos with zero advance notice and no disclosed basis. This second zeroing event is the fifth major enforcement action TikTok has taken against Plaintiff's accounts since January 2025. RPM remained at $0.00 through the remainder of June 2026. TikTok's June 2026 Performance dashboard documents the full scope of the June suppression: 5.4 million qualified views for the month, a blended RPM of $0.69, and total earnings of $3,831.92. At fair-market RPM of $2.00 per 1,000 qualified views, those same 5.4 million qualified views should have generated approximately $10,800 — a documented single-month

suppression gap of approximately $6,968.08. As documented in TikTok's own Rewards per video screen for the June 26, 2026, video "Let's GO!! #karmelo #lawyers #moti...": total video views 170,300; qualified views 108,000 certified by TikTok as legitimate; RPM $0.00; Additional Reward multiplier 3.00x; TikTok's own characterization: "high-quality, specialized, and engaging"; total earned: $0.84. A 3.00x multiplier of $0.00 is $0.00. TikTok's own system is internally contradictory — certifying content as high-quality while paying nothing for it.

On or about July 1, 2026, Plaintiff's RPM was restored, and the account followed the same characteristic monthly cycle documented in April, May, and June: an initial rebound followed by progressive decline throughout the month. RPM peaked at approximately $1.52 on July 10, 2026 — itself continuing the month-over-month decline in peak RPM documented above — then declined progressively through the remainder of the month, falling to $0.25 by July 13, ranging between $0.12 and $1.14 through mid-month, and falling to $0.20-$0.45 by July 19-20. On July 22, 2026 — the third consecutive month in which TikTok zeroed Plaintiff's RPM on the identical calendar date — RPM fell to $0.06, and TikTok zeroed it completely, to $0.00-$0.02, every day from July 23 through July 30, 2026, with no exception. A rate of $0.06 or less per 1,000 qualified views, on an account TikTok's own dashboard shows generating substantial views, is a zeroing in substance regardless of the final decimal; Plaintiff alleges, and the data confirm, that TikTok zeroed Plaintiff's RPM on July 22, 2026, exactly as it had on March 22 and June 22, 2026.

The recurrence of RPM zeroing on the identical calendar date — the 22nd — for three consecutive months, with no disclosed basis and no advance notice on any occasion, is a statistically improbable coincidence absent some undisclosed systemic mechanism. Defendant is uniquely positioned to explain this pattern through discovery of its internal RPM calculation, scheduling, and account-flagging systems.

The July 2026 zeroing is also the first documented instance in which RPM did not recover at or near the start of the following month, as it did after the March 22 zeroing

(restored April 1) and, on information and belief based on the pattern established, would be expected to following the June 22 zeroing. As of the date of this First Amended Complaint, Plaintiff's RPM has remained at $0.00 continuously since July 22, 2026 — longer than either of the two prior zeroing periods — with no notice, no disclosed basis, and no indication of when or whether it will be restored.

Plaintiff earned $3,831.92 in June 2026 and only $1,468.60 in July 2026 — a decline of approximately 62% — despite no reduction in @jasontbrook4's audience size, posting frequency, or content quality, and despite the account's continued growth throughout the period, as alleged in Section III.C above. This documented month-over-month collapse in earnings, occurring on an account that was simultaneously growing, is independent evidence that TikTok's suppression mechanism is not tied to any decline in Plaintiff's performance and directly corroborates the growth-punishment throttle alleged in Section III.C.

***E. The January 22, 2026 Corporate Restructuring and Contract Rewrite***

Effective January 22, 2026, TikTok Inc.'s United States platform operations were transferred to a newly formed entity, Defendant TikTok USDS Joint Venture LLC, pursuant to a restructuring publicly described as bringing the platform into compliance with the Protecting Americans from Foreign Adversary Controlled Applications Act. On the same date, TikTok USDS Joint Venture LLC published an entirely rewritten Terms of Service, superseding the Terms of Service that had governed the platform — and Plaintiff's relationship with it — since before January 2025.

The Terms of Service actually in effect at the time of the January and February 2025 terminations of @jasontbrooks and @jasontbrooks2, and at the time of the September 2025 strike and demonetization of @jasontbrook4 — verified by Plaintiff against the Internet Archive's Wayback Machine contemporaneous snapshots dated January 13, 2025 and September 2, 2025, respectively, which are identical in all material respects to one another — provided, in the section governing user accounts: "We reserve the right to disable your user account at any time, including if you have failed to comply with any of the provisions

of these Terms, or if activities occur on your account which, in our sole discretion, would or might cause damage to or impair the Services or infringe or violate any third party rights, or violate any applicable laws or regulations." This provision ties TikTok Inc.'s account-discipline authority to an actual violation of the Terms or an actual risk of the specified harms. It contains no "for any reason or no reason" language, no "without prior notice" language, and no "reason to believe" language applicable to account-level discipline. Those broader terms did not appear anywhere in the Terms of Service governing Plaintiff's relationship with TikTok Inc. at any time relevant to the January 2025, February 2025, or September 2025 enforcement actions alleged in this complaint.

The Terms of Service published by TikTok USDS Joint Venture LLC effective January 22, 2026, by contrast, provide: "We reserve the right, at any time and without prior notice, to ban or suspend your account, or restrict your access to features of the Platform, at our sole discretion, including if: we have reason to believe in our sole discretion that you have violated these Terms, our Community Guidelines, or other conditions or policies." This is a materially broader standard than the one that governed Plaintiff's relationship with TikTok Inc. throughout 2025, and it did not exist in any version of TikTok's Terms of Service until the January 22, 2026 rewrite — the same date TikTok USDS Joint Venture LLC assumed control of the platform. To the extent Defendants contend this broadened standard governs conduct that occurred before January 22, 2026, Plaintiff alleges that it does not: a unilateral contract amendment operates prospectively from the date a user is bound by it, and cannot retroactively authorize conduct that occurred under, and was governed by, the narrower standard actually in effect at the time.

TikTok USDS Joint Venture LLC provided notice of the January 22, 2026 Terms of Service change consistent with the prior Terms' requirement that TikTok "use commercially reasonable efforts to generally notify all users of any material changes." Plaintiff does not allege that notice was withheld. Plaintiff alleges that the notice provided him no meaningful choice. By January 22, 2026, Plaintiff had built @jasontbrook4 into an account with tens of thousands of followers and an established, growing Creator Rewards

Program income, all created and accumulated in reliance on the narrower discretion standard then in effect. The only alternative to continuing under the new, broadened terms was for Plaintiff to abandon @jasontbrook4 entirely — forfeiting the audience and income stream he had built specifically because TikTok Inc.'s prior Terms of Service represented that account discipline required an actual violation. This was not a meaningful choice between comparable alternatives; it was a choice between accepting materially adverse new terms or forfeiting a substantial, quantifiable asset built in reliance on the terms being replaced.

Plaintiff alleges, as set forth more fully in Count VIII below, that the January 22, 2026 amendment to the discretion standard governing account and content enforcement is unconscionable as applied to Plaintiff and other similarly situated, economically dependent creators, and, in the alternative, that Plaintiff's continued use of the platform under the amended Terms was not a product of free assent but of economic duress arising from TikTok USDS Joint Venture LLC's leverage over Plaintiff's already-accumulated, platform-dependent audience and income.

***F. The Bessent Video — Wrongful Removal and Viewpoint-Based Content Moderation***

In what would become another documented enforcement action against Plaintiff's content and accounts since January 2025, on April 19, 2026 at 3:42 PM, Plaintiff posted a video titled "This administration is laughable" (the "Bessent Video") to @jasontbrook4. The Bessent Video consisted of Plaintiff's political commentary alongside a recorded broadcast by a major news organization of United States Treasury Secretary Scott Bessent at an official White House press conference, during which Secretary Bessent advised Americans regarding federal tax withholding exemptions. The content is unambiguously protected political commentary on the official conduct of a sitting Cabinet official at an official government proceeding, broadcast by a credentialed news organization and rebroadcast by Plaintiff for purposes of political commentary and criticism.

The Bessent Video performed exceptionally well by every objective metric: 1.2 million total views, 96,700 likes, 1,604 comments, and 22,700 saves. It earned $1,209.83

in Creator Rewards at a $1.46 RPM — Plaintiff's highest-earning single video during the documented period. TikTok's algorithm promoted the Bessent Video to 1.2 million viewers, collected full advertising CPM revenue on those 1.2 million views, and paid Plaintiff $1,209.83 — demonstrating that at the time of the video's active monetization period, TikTok's own systems found no basis to suppress or remove it.

Months after the Bessent Video was posted and had fully monetized, TikTok removed it citing "Misinformation" as the violation reason. TikTok's own subsequent conduct — restoring the video the same day it was appealed, discussed below — is internally inconsistent evidence that does not require this Court to grade the content at all: TikTok's own later determination contradicts its own earlier one. Separately, and independently, "Misinformation" is defined and applied solely by TikTok under the same illusory violation standard alleged throughout this complaint, with no external mechanism capable of testing the label against the content. In the further alternative, Plaintiff alleges that a recorded broadcast of an official United States government press conference, aired by a credentialed national news organization, depicting a sitting Cabinet Secretary making official public statements in his governmental capacity, cannot constitute "misinformation" under any good-faith, reasonable, or non-pretextual application of TikTok's Community Guidelines. The removal was facially pretextual.

The timing of the removal is significant. TikTok allowed the Bessent Video to circulate to 1.2 million viewers, accumulate 96,700 likes and 22,700 saves, and fully monetize at $1,209.83 before removing it. TikTok collected full advertising CPM revenue on all 1.2 million views during the video's active period. The retroactive removal — after full monetization and full advertising revenue collection — allowed TikTok to retain 100% of the advertising revenue generated by the video while simultaneously suppressing the political commentary it contained from further circulation.

Plaintiff appealed the removal on June 28, 2026. TikTok restored the Bessent Video the same day — within hours of the appeal submission — confirming that the original removal was wrongful and that the video did not violate TikTok's Community Guidelines.

TikTok's own appeal process vindicated Plaintiff's position, demonstrating that the initial removal decision was not the product of any good-faith application of content standards.

Despite the successful same-day appeal and restoration of the Bessent Video, Plaintiff's RPM was not restored to any normalized rate for the remainder of June 2026. TikTok's own Creator Rewards Contract expressly states that "if a video or your account was disqualified but successfully appealed, your rewards will be included in the next payout cycle." Defendants did not comply with this express contractual provision at that time. Although RPM was subsequently restored on or about July 1, 2026, as alleged in Section III.D above, it was zeroed again on July 22, 2026, and remains at $0.00 as of the filing of this First Amended Complaint — meaning Plaintiff's RPM has still not been restored to a normalized rate following the successful Bessent Video appeal in any sustained sense. Plaintiff retained the original $1,209.83 earned on the Bessent Video during its active monetization period and does not allege that those specific earnings were clawed back.

Plaintiff alleges on information and belief, however, that TikTok's account-wide RPM zeroing mechanism may operate in part as an undisclosed internal offset or clawback mechanism — deployed when TikTok initiates a content removal determination, whether or not that determination is ultimately sustained on appeal. If the zeroing was triggered by or related to the Bessent Video removal determination, TikTok's failure to restore Plaintiff's RPM to a sustained normalized rate following the successful appeal — and its retention of all advertising revenue earned on Plaintiff's content during the June 22-30 and July 22-and-ongoing zeroing periods — constitutes an ongoing conversion of Plaintiff's earned revenue, compounded by the fact that the underlying content moderation action that may have triggered the zeroing was itself wrongful.

Whether or not the RPM zeroing is mechanically connected to the Bessent Video removal, the zeroing itself — implemented without notice, without disclosed basis, without contractual authorization, and without restoration following a successful appeal — is independently wrongful under each of the theories alleged herein. Defendant is uniquely

positioned to explain the relationship, if any, between its content removal determinations and its account-wide RPM zeroing mechanism through discovery of its internal systems. Plaintiff reserves the right to supplement these allegations following discovery.

***G. Viewpoint-Based RPM Suppression and the Industry Comparison***

Plaintiff's Creator Rewards Program dashboard data reveals a consistent and documented pattern of differential RPM treatment by content category within the same creator account, during the same periods, under the same Creator Rewards Contract. This within-account differential is not attributable to any disclosed metric including qualified view percentage, watch time, engagement rate, geographic distribution, or content quality score — TikTok's own system certifies Plaintiff's disfavored content as "high-quality, specialized, and engaging" while simultaneously paying suppressed or zero RPM on that same certified content.

The documented within-account RPM differential by content category is as follows. Content involving neutral or non-political topics — including consumer technology, personal finance, lifestyle commentary, and general social observation — consistently earned RPM at or above the account average during the periods when Plaintiff's RPM was functioning, earning rates of $1.00-$1.94 RPM. Content involving the Karmelo Anthony trial consistently earned RPM rates of $0.37-$0.53 during the same periods, representing a suppression of approximately 60-75% below the account average for neutral content. Content involving the Luigi Mangione prosecution similarly earned suppressed RPM rates inconsistent with the account's neutral-content baseline.

The most striking documented example of this within-account viewpoint differential is the comparison between two Karmelo Anthony trial videos posted by Plaintiff seventeen days apart: the June 9, 2026 video "His fight has just begun #karmelo" accumulated 1.7 million total views, 236,200 likes, 23,900 saves, and 17,900 shares, earning $354.11 at $0.37 RPM — when a fair-market RPM of $1.00 on those same views would have yielded approximately $1,700, representing a single-video suppression of approximately $1,346; and the June 26, 2026 video "Let's GO!! #karmelo #lawyers #moti..." accumulated 170,300

total views with 108,000 TikTok-certified qualified views, earning $0.84 at $0.00 Standard Reward RPM.

The viewpoint-based suppression pattern becomes even clearer when Plaintiff's RPM performance is compared against industry standards. Every major competing social media platform that operates a creator monetization program discloses a specific, binding revenue share percentage: YouTube pays creators 55% of long-form advertising revenue and 45% of Shorts revenue; Instagram pays creators 55% through its Ads on Reels program. TikTok is the only major platform that operates a creator monetization program while refusing to disclose the specific revenue share percentage, reserving the right to set creator share to $0.00 with no notice, applying an undisclosed monthly throttle mechanism, and applying differential RPM rates by content viewpoint without disclosure.

TikTok publicly represented at the launch of the Creator Rewards Program in 2024 that creators could earn RPM rates of $4.00-$8.00 per 1,000 qualified views. By 2026, actual documented RPM rates have declined to $0.40-$1.00 per 1,000 qualified views for most creators — an industry-wide decline of 80-90% from the advertised rate — before account-specific throttling and zeroing further reduce individual creator earnings below even this suppressed baseline. TikTok induced creators including Plaintiff to invest substantial creative labor, time, and audience-building effort on the platform in reliance on these representations, then systematically reduced the compensation structure while retaining the benefit of that creative investment.

Plaintiff alleges on information and belief that the within-account RPM differential documented herein reflects a deliberate, policy-driven decision by TikTok to financially suppress specific categories of political and social expression on its platform. Plaintiff does not name the United States government as a defendant in this action; those claims are the subject of a separate appeal pending before the United States Court of Appeals for the Ninth Circuit. Plaintiff alleges herein only that TikTok's conduct constitutes actionable misconduct by TikTok itself, independently of any government direction, under the legal theories alleged below.

***H. The Creator Rewards Contract: What Was Promised and What Was Concealed***

TikTok markets and operates the Creator Rewards Program as a revenue-sharing arrangement through which creators earn compensation proportional to the performance of their content. TikTok's own public marketing materials, Creator Academy documentation, and in-app representations describe the program as rewarding creators for "high-quality" content based on "legitimate video views," "viewer engagement," and "popularity." At the program's launch in 2024, TikTok publicly advertised RPM rates of $4.00-$8.00 per 1,000 qualified views to induce creators to invest their creative labor, time, and audience-building efforts on the TikTok platform.

The Creator Rewards Program contractual relationship between Plaintiff and TikTok is governed by TikTok's Creator Rewards Program Terms (last updated January 2026) and TikTok's Rewards Policy (together, the "Creator Rewards Contract"). The Creator Rewards Contract is a non-negotiable adhesion contract drafted entirely by TikTok, presented to creators on a take-it-or-leave-it basis with no opportunity to negotiate any term.

The Creator Rewards Contract discloses the following material terms: (a) TikTok "may reward Creators based on their contributions and the popularity of their Eligible Videos, including based on total legitimate video views and other signals reflecting the popularity of, and engagement with, Eligible Videos, in TikTok USDS Joint Venture's sole discretion"; (b) "TikTok reserves the right to impose a monthly or annual cap on each Creator's available rewards for Eligible Videos"; (c) "From time to time, we may modify or cease rewards under this program. If we do so, we will provide you with reasonable advance notice before any such changes come into effect"; (d) "Any rewards accumulated under the Program will be calculated in the month following the date that the rewards were earned"; and (e) "If a video or your account was disqualified but successfully appealed, your rewards will be included in the next payout cycle."

The Creator Rewards Contract does not disclose the following material facts, each of which is independently material to a creator's decision to participate in the program: (a) the specific revenue share percentage TikTok pays to creators; (b) the existence of a

monthly RPM throttle mechanism; (c) that RPM can be set to $0.00 on a creator's account while TikTok continues to collect full advertising CPM revenue; (d) that the "monthly or annual cap" can be set to $0.00; (e) the criteria, if any, governing when TikTok applies a "Disqualified" label to a video, including videos Plaintiff has made private for personal reasons unrelated to any policy violation; (f) that RPM rates are applied differentially based on content viewpoint within the same creator account; and (g) that the "reasonable advance notice" promised before modifying rewards has never been provided in connection with the March 22, June 22, or July 22, 2026 zeroing events.

The Creator Rewards Contract is illusory and unenforceable as a matter of California contract law. A contract in which one party promises to share revenue but simultaneously reserves the absolute right to share nothing — with no disclosed formula, no binding percentage, no floor, and no meaningful limitation — is not a revenue-sharing contract. Under California law, an illusory promise cannot serve as valid consideration and renders the contract unenforceable by either party. When the contract fails as illusory, the law imposes a quasi-contractual obligation requiring TikTok to pay the reasonable market value of the benefit it received. In the alternative, if the Creator Rewards Contract is deemed enforceable, TikTok has breached it through the specific acts alleged throughout this complaint.

***I. Alternative Theories of RPM Suppression, Pled in the Alternative Pursuant to Federal Rule of Civil Procedure 8(d)(2)***

Plaintiff does not currently possess complete knowledge of the internal mechanism by which TikTok zeroed his RPM on March 22, 2026, June 22, 2026, and July 22, 2026, and by which TikTok applies the monthly throttle documented throughout this complaint. That information is exclusively within TikTok's possession and control and is properly the subject of discovery. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiff pleads the following alternative theories of the RPM suppression mechanism, each of which independently supports the claims alleged herein.

**Theory One — Undisclosed Same-Date Systemic Mechanism.** Plaintiff's RPM was zeroed to $0.00 on March 22, 2026, again on June 22, 2026, and again on July 22, 2026 — the identical calendar date recurring in three consecutive documented zeroing events, with no disclosed basis and no advance notice on any occasion. Plaintiff further alleges, on information and belief, that this mechanism operates in tandem with Plaintiff's account growth rather than independently of it: the suppression has coincided with, and appears calibrated to offset, the increased earnings that Plaintiff's growing audience and view counts would otherwise generate, as alleged in Section III.C and III.D above.

**Theory Two — Undisclosed Clawback or Offset Mechanism Tied to Content Removal Determinations.** Plaintiff alleges on information and belief that TikTok's account-wide RPM zeroing mechanism may operate in part as an undisclosed internal financial offset — deployed when TikTok initiates a content removal determination affecting a creator's account, as a hedge against earnings on videos under removal review.

**Theory Three — Viewpoint-Based Account Suppression Flag.** Plaintiff alleges on information and belief that TikTok maintains internal account-level suppression flags that can be applied to specific creator accounts whose content reaches a threshold of disfavored political expression.

**Theory Four — Undisclosed Monthly Earnings Cap Exhaustion.** TikTok's own Creator Rewards Contract discloses that "TikTok reserves the right to impose a monthly or annual cap on each Creator's available rewards for Eligible Videos." It is plausible that TikTok has set Plaintiff's effective monthly cap at or near zero.

Under each of the foregoing alternative theories, and under any combination thereof, TikTok's conduct is independently actionable under the legal theories alleged in the Claims for Relief section below. Discovery will determine which theory or theories are factually supported by TikTok's internal records.

**J. The May-July 2026 Four-Strike Escalation and Renewed Risk of Account Termination**

Between May and July 2026, TikTok issued four additional strikes against @jasontbrook4, placing the account at renewed risk of the same permanent termination TikTok already inflicted twice, in January and February 2025, against Plaintiff's earlier accounts. As with every enforcement action alleged in this complaint, none of the four strikes was based on any actual, verifiable violation of TikTok's stated policies; each was justified solely by reference to the same illusory "violation" standard alleged in Section III.A above, and each is independently evidence of the same pattern of pretextual, viewpoint-based enforcement.

On May 6, 2026, TikTok struck a video in which Plaintiff satirically joked that the current administration would allow a hantavirus outbreak to spread unchecked, in the manner of its handling of COVID-19. TikTok cited "misinformation" as the basis for the strike. The video was plainly satirical political commentary on government pandemic policy, not a factual claim about hantavirus transmission, and no reasonable, good-faith application of a misinformation policy would treat obvious political satire as a factual misrepresentation requiring correction.

On May 24, 2026, TikTok struck a video in which Plaintiff shared documented clinical information regarding his father's cancer diagnosis and treatment. TikTok cited "misinformation" as the basis for the strike. The video conveyed accurate, documented medical information regarding a personal family matter; TikTok has never identified what statement in the video it contends was false or misleading, consistent with the illusory nature of the "violation" standard alleged throughout this complaint — a standard that requires no factual specificity because no external mechanism ever tests it.

On July 1, 2026, TikTok struck a video Plaintiff posted in direct response to another creator's video bullying and harassing him. TikTok cited "bullying" as the basis for the strike against Plaintiff's response. TikTok did not remove, and has not to date removed, the original creator's video that prompted Plaintiff's response, despite that video being the

source of the harassment Plaintiff was responding to. TikTok's willingness to strike Plaintiff's response while leaving the underlying, provoking content untouched is direct evidence that TikTok's "bullying" determination was not a neutral application of its own policy to the actual conduct at issue, but a selective enforcement decision reaching only Plaintiff's side of the exchange.

On July 12, 2026 — the day of United States Senator Lindsey Graham's death — Plaintiff posted a video expressing that he was glad Senator Graham had died, which accumulated more than 20,000 views before TikTok struck it, citing "harassment and bullying." Plaintiff alleges that a deceased individual cannot, as a matter of ordinary meaning, be the target of harassment or bullying, and that TikTok's invocation of that label against commentary about a person no longer living is facially inconsistent with any coherent application of the policy TikTok claims to be enforcing. Plaintiff further alleges, in the alternative, that even if TikTok intended its "harassment and bullying" determination to reach commentary affecting a deceased public official's family, supporters, or associates, TikTok has never identified any specific person Plaintiff's video is alleged to have harassed, which is independently consistent with the illusory, self-defined nature of the "violation" standard alleged in Section III.A above.

Each of these four strikes counts toward TikTok's undisclosed strike threshold for permanent account termination, placing @jasontbrook4 at renewed, live risk of the same permanent, irreversible account destruction TikTok already twice inflicted on Plaintiff in January and February 2025. Plaintiff reserves the right to seek emergency injunctive relief should TikTok terminate @jasontbrook4 during the pendency of this action.

## IV. CLAIMS FOR RELIEF

### COUNT I — BREACH OF CONTRACT

*(California Common Law)*

*(Against Defendant TikTok Inc. as to Breaches One through Three; against both Defendants as to Breaches Four through Eleven as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

The contractual relationship between Plaintiff and TikTok is governed by multiple overlapping agreements including TikTok's Terms of Service, Community Guidelines, Appeals Policy, and Creator Rewards Program Terms (together the "TikTok Contracts"), as those agreements existed at the time of each breach alleged below. Each of these agreements imposes specific binding obligations on TikTok that TikTok has systematically breached across a documented course of conduct spanning January 2025 through the date of this filing.

**Breach One — Wrongful Termination of @jasontbrooks.** The Terms of Service in effect in January 2025, verified against the January 13, 2025 Internet Archive snapshot, provided that TikTok Inc. could disable an account only "if you have failed to comply with any of the provisions of these Terms, or if activities occur on your account which, in our sole discretion, would or might cause damage to or impair the Services or infringe or violate any third party rights, or violate any applicable laws or regulations." In January 2025, TikTok Inc. terminated @jasontbrooks — which had grown to approximately 19,000 followers through entirely lawful political commentary — without any legitimate basis under this standard, without meaningful notice, and without any functional appeal process. As alleged in Section III.A above, this "violation" standard is illusory: TikTok is the sole author, enforcer, and unreviewable interpreter of what qualifies, and no external mechanism exists to test its determination. TikTok's invocation of the standard here was accordingly not the exercise of any enforceable contractual right. In the further alternative, no reasonable, good-faith application of this standard would support the termination of

@jasontbrooks. The termination was wrongful, pretextual, and in direct breach of TikTok Inc.'s Terms of Service, Community Guidelines, and Appeals Policy as then in effect. As a direct result, Plaintiff suffered the permanent and irreversible destruction of approximately 19,000 followers — an audience destruction rate of 96.3% — and the loss of all Creator Rewards earnings that account would have generated going forward.

**Breach Two — Wrongful Termination of @jasontbrooks2.** In February 2025, under the identical January 2025 Terms of Service standard quoted in Breach One above, TikTok Inc. wrongfully terminated @jasontbrooks2 — the second consecutive wrongful termination of a Plaintiff account within approximately thirty days, targeting the same creator for the same category of lawful political expression. As with Breach One, TikTok's invocation of a "violation" it never specified was not the exercise of any enforceable contractual right under the illusory standard alleged in Section III.A above. In the further alternative, no reasonable, good-faith application of that standard would support the termination of @jasontbrooks2. This second wrongful termination constitutes a second independent breach of TikTok Inc.'s Terms of Service, Community Guidelines, and Appeals Policy, and reduced Plaintiff's audience to zero followers, forcing him to restart entirely from scratch.

**Breach Three — Failure to Provide Meaningful Appeal Process.** TikTok's Appeals Policy expressly provides creators with the right to appeal adverse content moderation and account termination decisions and implicitly requires that such appeals receive meaningful human review before a determination is made. Across every enforcement action TikTok has taken against Plaintiff's accounts — the termination of @jasontbrooks, the termination of @jasontbrooks2, the September 2025 strike and demonetization, and the Bessent Video removal — TikTok's appeal process has been applied as a sham. Appeals have been denied instantaneously — within seconds of submission — making it factually impossible that any meaningful human review occurred before any denial was issued. This consistent pattern constitutes a systematic breach of

TikTok's Appeals Policy and the implied obligation to provide creators with a genuine dispute resolution mechanism.

**Breach Four — Wrongful September 2025 Strike and Demonetization.** In September 2025, under the same January/September 2025 Terms of Service standard, TikTok Inc. issued a strike against @jasontbrook4 and demonetized the account, citing "hate speech," "hateful behavior," and "violent extremism." As alleged in Section III.A above, these labels are defined and applied solely by TikTok under an illusory standard no external mechanism can test, and TikTok's invocation of them was accordingly not the exercise of any enforceable contractual right. TikTok's own subsequent conduct independently corroborates this: on January 20, 2026, TikTok restored Plaintiff's monetization without any stated basis, a determination inconsistent with its own September 2025 characterization. In the further alternative, Plaintiff alleges that these characterizations cannot survive scrutiny under any reasonable, good-faith application of that standard. The September 2025 strike and demonetization constitute a breach of TikTok Inc.'s Terms of Service, Community Guidelines, Appeals Policy, and the implied covenant of good faith and fair dealing, causing Plaintiff approximately $19,950 in lost Creator Rewards earnings across the five-month demonetization period.

**Breach Five — Failure to Provide Reasonable Advance Notice Before March 22, 2026 Zeroing.** TikTok's Creator Rewards Contract expressly states: "we will provide you with reasonable advance notice before any such changes come into effect." On March 22, 2026, TikTok zeroed Plaintiff's RPM to $0.00 account-wide with zero advance notice of any kind. This is a direct, unambiguous, and documented breach of TikTok's own express written contractual obligation, causing Plaintiff approximately $2,097 in direct earnings losses across the nine-day zeroing period.

**Breach Six — Failure to Provide Reasonable Advance Notice Before June 22, 2026 Zeroing.** On June 22, 2026, TikTok USDS Joint Venture LLC again zeroed Plaintiff's RPM to $0.00 account-wide with zero advance notice — the identical calendar date as the first zeroing, three months later. RPM remained at $0.00 through the end of June 2026

before being restored on or about July 1, 2026. This constitutes a second independent breach of the same express contractual notice obligation, contributing to the approximately $6,968.08 single-month suppression gap documented in Section III.D above for June 2026.

**Breach Seven — Failure to Restore Rewards Following Successful Bessent Video Appeal.** TikTok's Creator Rewards Contract expressly states that successfully appealed videos will have their rewards included in the next payout cycle. Plaintiff successfully appealed the wrongful removal of the Bessent Video on June 28, 2026, and TikTok restored it the same day. Despite this successful appeal, TikTok USDS Joint Venture LLC did not restore Plaintiff's RPM to any normalized rate for the remainder of June 2026, and — as alleged in Section III.D above — RPM was zeroed again on July 22, 2026, after only a brief restoration, meaning Plaintiff's rewards have still not been sustainably restored following the successful appeal, in direct breach of this express contractual provision.

**Breach Eight — Application of Undisclosed Monthly Throttle Mechanism.** TikTok has systematically applied an undisclosed monthly throttle mechanism that progressively reduces Plaintiff's RPM throughout each month, while continuing to collect full advertising CPM revenue from advertisers throughout the same period.

**Breach Nine — Wrongful Four-Month Exclusion from Creator Rewards Program.** Plaintiff satisfied every stated objective eligibility threshold for the Creator Rewards Program by approximately late March 2025, yet was not accepted until August 2025 — approximately four months later — without explanation. This four-month wrongful exclusion constitutes a breach of the implied covenant of good faith and fair dealing and an additional breach of the Creator Rewards Contract, causing Plaintiff approximately $11,760 in lost earnings.

**Breach Ten — Failure to Provide Reasonable Advance Notice Before the July 22, 2026 Zeroing, and Ongoing Failure to Restore RPM.** On July 22, 2026, TikTok USDS Joint Venture LLC again zeroed Plaintiff's RPM to $0.00 — the third consecutive month in which this occurred on the identical calendar date — and RPM has remained at

$0.00 continuously through the date of this filing, longer than either of the two prior zeroing periods, with zero advance notice at any point. Plaintiff earned only $1,468.60 in July 2026, a decline of approximately 62% from June 2026's $3,831.92, despite the account's continued growth. This constitutes a third independent breach of TikTok's express contractual notice obligation and an ongoing breach of TikTok's obligation to pay earned rewards, causing Plaintiff damages to be proven at trial, continuing to accrue daily until RPM is restored.

**Breach Eleven — The May-July 2026 Four-Strike Escalation.** Between May 6 and July 12, 2026, TikTok struck four additional videos — the hantavirus satire video (May 6), the documented cancer-information video (May 24), the bullying-response video (July 1), and the Lindsey Graham video (July 12) — each citing a "violation" that, as alleged in Section III.J above, TikTok has never substantiated against any ascertainable standard. Each strike is an independent breach of TikTok's Terms of Service, Community Guidelines, and Appeals Policy, and collectively they place @jasontbrook4 at renewed risk of the same permanent account termination TikTok has twice already wrongfully inflicted on Plaintiff.

As a direct and proximate result of Defendants' breaches alleged in the preceding paragraphs, Plaintiff has suffered damages including: the permanent destruction of approximately 19,000 followers across two wrongful account terminations; approximately $19,950 in lost earnings during the five-month wrongful demonetization; approximately $11,760 in lost earnings during the four-month wrongful Creator Rewards Program exclusion; approximately $2,097 in lost earnings during the March 22-30 zeroing; approximately $6,968.08 in single-month suppression losses during the June 2026 zeroing; the documented $2,363.32 (approximately 62%) decline in earnings from June 2026 ($3,831.92) to July 2026 ($1,468.60) despite the account's continued growth; ongoing daily losses from the July 22, 2026 zeroing, which remains unresolved as of the date of this filing; cross-video suppression losses across all affected periods estimated to exceed $50,000; and permanent future earnings losses from the irreversible destruction of

approximately 213,744 followers valued at approximately $6,650/month ongoing — all in an aggregate amount to be proven at trial.

## COUNT II — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

*(California Common Law)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Every contract governed by California law carries an implied covenant that neither party will act in bad faith to deprive the other of the benefits of the bargain, and that each party will exercise any contractual discretion honestly, fairly, and in accordance with the reasonable expectations of the other party. This covenant applies with particular force where, as here, one party has been granted broad discretionary authority — such as TikTok's "sole discretion" to determine creator rewards and, as of January 22, 2026, TikTok USDS Joint Venture LLC's broadened "sole discretion" to ban or suspend accounts — because such discretion must be exercised in good faith and cannot be used as a weapon to strip the other party of the core benefit of the contractual relationship.

The core benefits of the TikTok Contracts to Plaintiff are: (a) the right to maintain an active account and publish lawful political expression without arbitrary termination; (b) the right to a meaningful appeal process when adverse enforcement actions are taken; (c) meaningful, performance-based compensation for qualifying content through the Creator Rewards Program; and (d) enforcement of TikTok's stated content policies on a viewpoint-neutral basis. TikTok has systematically deprived Plaintiff of every one of these core benefits through the following acts of bad faith:

**Bad Faith Act One — Pattern of Pretextual Enforcement.** TikTok has taken eleven documented enforcement actions against Plaintiff's accounts across more than eighteen months — the terminations of @jasontbrooks and @jasontbrooks2, the September 2025 demonetization, the March 22, June 22, and July 22, 2026 zeroing events,

the Bessent Video removal, and the four May-July 2026 strikes alleged in Section III.J above — each of which was pretextual, each of which was implemented without notice, and each of which targeted the same creator for the same category of lawful political expression.

**Bad Faith Act Two — Sham Appeal Process.** TikTok has denied every appeal Plaintiff has submitted across every enforcement action — instantaneously, within seconds, without any meaningful human review.

**Bad Faith Act Three — Same-Date RPM Zeroing Pattern.** TikTok zeroed Plaintiff's RPM on March 22, 2026, June 22, 2026, and July 22, 2026 — the identical calendar date in three consecutive months — with zero advance notice on any occasion, in direct violation of TikTok's own express written notice obligation.

**Bad Faith Act Four — Certification of Content as High-Quality While Paying $0.00 RPM.** TikTok's own Creator Rewards dashboard simultaneously certifies Plaintiff's content as "high-quality, specialized, and engaging," applies a 3.00x Additional Reward multiplier, and pays $0.00 in Standard Reward RPM on 108,000 certified qualified views.

**Bad Faith Act Five — Collection of 100% Advertising Revenue During $0.00 RPM Periods.** During every period in which TikTok has set Plaintiff's RPM to $0.00, TikTok has continued to collect full advertising CPM revenue from advertisers on every view of Plaintiff's content.

**Bad Faith Act Six — Viewpoint-Based RPM Differential.** TikTok applies systematically lower RPM rates to Plaintiff's political and racial justice content than to neutral content from the same account during the same periods.

**Bad Faith Act Seven — Declining Monthly Earnings Ceiling.** The documented decline in Plaintiff's monthly peak RPM across three consecutive months — April peak $2.22, May peak $1.70, June peak $1.39 — demonstrates a systematic, progressive reduction in the maximum compensation TikTok is willing to pay Plaintiff for his content, independent of any change in content quality, engagement, or qualified view performance.

**Bad Faith Act Eight — Bad-Faith Exercise of the January 2026 Broadened Discretion Against a Preexisting, Economically Dependent Creator.** Since January 22, 2026, TikTok USDS Joint Venture LLC has possessed and exercised a materially broadened "sole discretion, any reason, without notice" standard that did not exist in any version of the Terms of Service governing Plaintiff's account before that date. Plaintiff does not ask this Court to determine whether any particular item of his content independently satisfied TikTok's Community Guidelines; Plaintiff instead alleges that TikTok USDS Joint Venture LLC's own records demonstrate that its exercise of this discretion against Plaintiff's account is internally inconsistent with its own contemporaneous determinations about the same content, which is evidence that the discretion is not being exercised for any of the reasons the clause purports to authorize. This evidence includes: TikTok's own certification of the June 26, 2026 video as "high-quality, specialized, and engaging" while paying $0.00 for it; TikTok's acceptance of Plaintiff into the Creator Rewards Program in August 2025, which necessarily reflected a determination that his content complied with TikTok's policies, followed weeks later by a strike on the same category of content; and TikTok's own same-day reversal of the Bessent Video removal on appeal, confirming that TikTok's own initial determination was wrong by TikTok's own later measure. A discretion clause exercised in a manner that repeatedly contradicts the discretion-holder's own contemporaneous determinations about the same content, against a creator whose economic dependence on the platform TikTok USDS Joint Venture LLC's own predecessor's narrower Terms of Service had induced, is not a good-faith exercise of that discretion regardless of how broadly the clause is written.

**Bad Faith Act Nine — Suppression Calibrated to Offset Growth.** TikTok's monthly peak RPM has declined in every month for which Plaintiff has data — April $2.22, May $1.70, June $1.39 — during the same period that @jasontbrook4 grew from approximately 130,000 to over 224,400 followers, and Plaintiff's total monthly earnings fell approximately 62%, from $3,831.92 in June 2026 to $1,468.60 in July 2026, despite no decline in the account's audience, posting frequency, or content quality. Exercising

discretion to suppress a creator's compensation in proportion to that creator's growth — rather than in proportion to any decline in performance, engagement, or compliance — deprives Plaintiff of the core benefit the Creator Rewards Program purports to offer and is not a good-faith exercise of any discretion TikTok's contracts confer.

**Bad Faith Act Ten — Selective Enforcement Against the Bullying-Response Video.** On July 1, 2026, TikTok struck Plaintiff's video responding to another creator's video bullying and harassing him, citing "bullying," while leaving the original, provoking video untouched. Enforcing a "bullying" policy against the response while declining to enforce it against the underlying conduct that provoked the response is not a neutral, good-faith application of that policy to the conduct TikTok claims to be addressing; it is a one-sided enforcement decision that deprived Plaintiff of the core benefit of viewpoint-neutral policy enforcement TikTok's Terms of Service and Community Guidelines purport to provide.

As a direct and proximate result of Defendants' bad faith conduct alleged in the preceding paragraphs, Plaintiff has suffered damages in an amount to be proven at trial, including all damages alleged in Count I and additional damages for the bad faith nature of Defendants' conduct.

## COUNT III — CONVERSION

*(California Common Law)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Conversion is the wrongful exercise of dominion over another's property. Plaintiff had a specific, vested property interest in rewards already earned under the Creator Rewards Contract at the time of each of the following acts by TikTok. All three elements of conversion are established with respect to each documented instance: (1) Plaintiff's ownership or right to possession of the property; (2) TikTok's conversion by wrongful act; and (3) damages.

**First Conversion — March 22, 2026 Zeroing.** At the time of the March 22, 2026 zeroing, Plaintiff had accumulated Creator Rewards earnings during March 2026 that were in TikTok's calculation pipeline and to which Plaintiff had a vested contractual right. By zeroing Plaintiff's RPM on March 22, 2026, without notice or contractual authorization, TikTok wrongfully exercised dominion over Plaintiff's accumulated March 2026 rewards. The amount of this conversion is estimated at approximately $2,097.

**Second Conversion — June 22, 2026 Zeroing.** By zeroing Plaintiff's RPM on June 22, 2026, without notice or contractual authorization, TikTok USDS Joint Venture LLC wrongfully exercised dominion over Plaintiff's accumulated June 2026 rewards through the remainder of that month, contributing to the approximately $6,968.08 single-month suppression gap documented in Section III.D above.

**Third Conversion — July 22, 2026 Zeroing.** By zeroing Plaintiff's RPM on July 22, 2026, without notice or contractual authorization, and continuing through the date of this filing, TikTok USDS Joint Venture LLC has wrongfully exercised dominion over Plaintiff's accumulated July 2026 and ongoing rewards. This conversion is reflected in the documented $2,363.32 decline in Plaintiff's earnings from June 2026 ($3,831.92) to July 2026 ($1,468.60), and continues to accrue daily until RPM is restored.

As a direct and proximate result of Defendants' conversions alleged in the preceding paragraphs, Plaintiff has suffered damages of approximately $2,097 in documented converted property from the March 22, 2026 zeroing, plus the documented June and July 2026 suppression losses alleged above, plus ongoing daily accrual from the July 22, 2026 zeroing, in an amount to be proven at trial.

**COUNT IV — UNJUST ENRICHMENT**

*(California Common Law)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Unjust enrichment occurs when a party retains a benefit conferred by another under circumstances where retention of that benefit without compensation would be inequitable. TikTok has been unjustly enriched at Plaintiff's expense through the following documented acts, in each of which TikTok collected full advertising CPM revenue on Plaintiff's content while paying Plaintiff nothing or a fraction of the fair-market value of that content:

**Unjust Enrichment Instance One — Advertising Revenue During Account Termination Periods.** When TikTok Inc. wrongfully terminated @jasontbrooks and @jasontbrooks2, TikTok had already collected advertising revenue on every view those accounts generated during their active periods.

**Unjust Enrichment Instance Two — Advertising Revenue During Five-Month Demonetization.** During the five-month wrongful demonetization period from September 2025 through January 2026, TikTok continued to collect full advertising CPM revenue while paying Plaintiff $0.00, in the amount of approximately $19,950.

**Unjust Enrichment Instance Three — Advertising Revenue During Four-Month Creator Rewards Exclusion.** TikTok's retention of advertising revenue collected during the four-month exclusion period constitutes unjust enrichment in the amount of approximately $11,760.

**Unjust Enrichment Instance Four — Advertising Revenue During March 22-30 Zeroing.** TikTok retained 100% of the advertising revenue generated during this nine-day period.

**Unjust Enrichment Instance Five — Advertising Revenue During the June 22, 2026 Zeroing.** TikTok USDS Joint Venture LLC's retention of 100% of the advertising revenue generated by Plaintiff's content during the June 22-30, 2026 zeroing period constitutes unjust enrichment.

**Unjust Enrichment Instance Six — Advertising Revenue on Bessent Video.** TikTok's retention of the advertising revenue collected on 1.2 million views of a video whose removal was subsequently determined to be wrongful constitutes unjust enrichment.

**Unjust Enrichment Instance Seven — Cross-Video RPM Suppression.** The difference of $6,968.08 between fair-market and actual June 2026 earnings represents advertising revenue TikTok collected but retained rather than sharing with Plaintiff at the fair-market rate.

**Unjust Enrichment Instance Eight — Advertising Revenue During the July 22, 2026 and Ongoing Zeroing.** TikTok USDS Joint Venture LLC's ongoing retention of 100% of the advertising revenue generated by Plaintiff's content since the July 22, 2026 zeroing, which remains unresolved as of this filing, constitutes continuing, accruing unjust enrichment.

As a direct and proximate result of Defendants' unjust enrichment alleged in the preceding paragraphs, Plaintiff is entitled to restitution of all advertising revenue wrongfully retained by Defendants during the periods alleged, in an amount to be proven at trial.

## COUNT V — FRAUD BY OMISSION AND FRAUDULENT CONCEALMENT

*(California Civil Code § 1710)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

California Civil Code § 1710 defines fraud to include the suppression of a fact by one who is bound to disclose it, or the giving of information of other facts that are likely to mislead for want of communication of the suppressed fact. TikTok has committed fraud by omission and fraudulent concealment through the suppression of the following material facts:

**Material Omission One — No Disclosed Revenue Share Percentage.** TikTok markets and operates the Creator Rewards Program as a revenue-sharing arrangement but has never disclosed the specific percentage of advertising revenue it pays to creators.

**Material Omission Two — Undisclosed Monthly RPM Throttle.** TikTok has never disclosed the existence of a monthly RPM throttle mechanism.

**Material Omission Three — Ability to Set RPM to $0.00 While Retaining 100% of Advertising Revenue.** No reasonable creator would invest substantial creative labor in a platform that reserved the right to pay them nothing while retaining all resulting advertising revenue.

**Material Omission Four — Undisclosed "Disqualified" Label Criteria.** TikTok has never disclosed the criteria governing when a video is marked "Disqualified," a label TikTok has applied to multiple Plaintiff videos in July 2026 with no stated basis, including videos Plaintiff made private for personal reasons unrelated to any policy violation.

**Material Omission Five — Viewpoint-Based RPM Differential.** TikTok has never disclosed that RPM rates are applied differentially based on content viewpoint.

**Material Omission Six — Bait-and-Switch RPM Decline.** TikTok never disclosed the systematic decline from advertised to actual RPM rates to creators who had already invested in the platform in reliance on the higher advertised rates.

Plaintiff reasonably relied on TikTok's representations and omissions by investing substantial creative labor, time, and effort in building @jasontbrook4 from zero to 224,400 followers. As a direct and proximate result of TikTok's fraudulent concealment, Plaintiff suffered damages in an amount to be proven at trial, plus punitive damages in an amount sufficient to deter TikTok from continuing this conduct.

**COUNT VI — MISREPRESENTATION AND FALSE ADVERTISING**

*(Cal. Bus. & Prof. Code § 17500; California Common Law)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

California Business and Professions Code § 17500 prohibits any person from making or disseminating any statement concerning services that is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. TikTok has made the following false and misleading representations:

**Misrepresentation One — Performance-Based Compensation.** TikTok has publicly represented that the Creator Rewards Program rewards creators for "high-quality" content based on "legitimate video views," "viewer engagement," and "popularity."

**Misrepresentation Two — Advertised RPM Rates.** At the Creator Rewards Program's launch in 2024, TikTok publicly advertised RPM rates of $4.00-$8.00 per 1,000 qualified views.

**Misrepresentation Three — Neutral Content Moderation.** TikTok has publicly represented that it is a neutral platform that "welcomes diverse perspectives" and supports "free expression." As alleged in Misrepresentation Six below, this representation holds out TikTok's enforcement decisions as governed by a real, ascertainable, and neutrally-applied standard, when the standard is in fact illusory and self-defined.

**Misrepresentation Four — Meaningful Appeal Process.** TikTok's Appeals Policy represents to creators that adverse enforcement decisions will receive meaningful review before being finalized.

**Misrepresentation Five — False Free Speech Platform Representation.** TikTok has publicly and formally represented — including in legal proceedings before the United States Supreme Court, in Congressional testimony, and in public marketing materials — that it is a neutral free speech platform, notwithstanding the illusory and unreviewable nature of the enforcement standard alleged herein.

**Misrepresentation Six — Illusory, Unfalsifiable Violation Standard Represented as a Real Governing Rule.** TikTok represents to creators and the public, through its Terms of Service, Community Guidelines, and Appeals Policy, that account and content enforcement decisions are governed by objective, ascertainable violations of its stated policies. In fact, and as alleged throughout this complaint, TikTok is the sole author, sole enforcer, and sole and unreviewable interpreter of what constitutes a violation, with no external mechanism — including no functional internal appeal — capable of testing any violation determination against the actual content. TikTok knows, and has known throughout the relevant period, that no court or jury can compel it to justify any

individual content-enforcement decision, because 47 U.S.C. § 230(c)(1) immunizes TikTok from liability for such decisions regardless of their basis. TikTok's representation that its enforcement is violation-based and neutral, made with knowledge that the standard underlying that representation is both self-defined and functionally unreviewable by anyone but TikTok, is false and misleading, and materially induces creators including Plaintiff to invest creative labor and build audiences on the platform in reliance on a governing standard TikTok knows cannot be enforced or verified.

Plaintiff reasonably relied on each of the foregoing misrepresentations. As a direct and proximate result of TikTok's misrepresentations, Plaintiff suffered all damages alleged throughout this complaint in an amount to be proven at trial.

## COUNT VII — VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

*(Cal. Bus. & Prof. Code § 17200 et seq.)*

*(Against both Defendants as alleged)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. TikTok's conduct alleged throughout this complaint constitutes unlawful, unfair, and fraudulent business practices within the meaning of § 17200 under each of the statute's three prongs independently.

**Unlawful Prong.** TikTok's conduct is unlawful in that it constitutes breach of contract, breach of the implied covenant, conversion, unjust enrichment, fraud by omission, and misrepresentation and false advertising, each alleged above.

**Unfair Prong.** TikTok's conduct is unfair in that it causes substantial harm to creators that is not outweighed by any countervailing legitimate business justification.

**Fraudulent Prong.** TikTok's public representations are likely to deceive reasonable creators into believing their compensation will reflect actual content performance and that their political expression will be treated on a viewpoint-neutral basis.

Plaintiff has suffered injury in fact and lost money as a result of TikTok's unfair competition. Pursuant to California Business and Professions Code § 17203, Plaintiff seeks restitution and injunctive relief.

**COUNT VIII — DECLARATORY AND COMPENSATORY RELIEF: UNCONSCIONABILITY, ILLUSORY CONTRACT, AND ECONOMIC DURESS**

*(Cal. Civ. Code §§ 1670.5, 1550; Declaratory Relief Act; Economic Duress)*

*(Against Defendant TikTok Inc. as to the Creator Rewards Contract's original sole-discretion provision and the account/content "violation" standard governing conduct through January 21, 2026; against Defendant TikTok USDS Joint Venture LLC as to the January 22, 2026 amended discretion standard and the account/content "violation" standard governing conduct on and after January 22, 2026)*

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

An actual controversy exists between Plaintiff and Defendants regarding the enforceability of the Creator Rewards Contract, its constituent provisions, and the January 22, 2026 amendment to the Terms of Service governing account and content enforcement. Defendants contend their conduct is authorized by these provisions. Plaintiff contends these provisions are unenforceable as illusory, unconscionable, or the product of economic duress, and that Defendants' conduct is therefore not authorized by any enforceable contractual term.

**Position One — Illusory Contract.** The Creator Rewards Contract is illusory and unenforceable as a matter of California contract law. A contract in which one party promises to share revenue but simultaneously reserves the absolute right to share nothing — with no disclosed formula, no binding percentage, no floor, and no meaningful limitation — is not a revenue-sharing contract. Under California law, an illusory promise cannot serve as valid consideration and renders the contract unenforceable by either party. When the contract fails as illusory, TikTok owes Plaintiff the reasonable market value of the benefit it received under quasi-contractual principles.

**Position Two — Unconscionability.** In the alternative, if the Creator Rewards Contract is deemed enforceable, the following provisions are unconscionable under California Civil Code § 1670.5 and should be declared void and unenforceable: the undisclosed monthly RPM throttle mechanism; and the "sole discretion" provision allowing TikTok to set creator RPM to $0.00 while collecting full advertising revenue. Separately and independently, the January 22, 2026 amendment broadening TikTok USDS Joint Venture LLC's discretion to ban or suspend an account "at any time and without prior notice... for any reason" is unconscionable as applied to Plaintiff. It is procedurally unconscionable because it was presented on a take-it-or-leave-it basis to a creator who, by January 22, 2026, had already built substantial, quantifiable economic value on the platform — approximately 224,400 followers and an established Creator Rewards income — in reliance on the narrower discretion standard the amendment replaced, such that the only realistic alternative to accepting the amendment was forfeiting that already-accumulated value. It is substantively unconscionable because it purports to authorize TikTok USDS Joint Venture LLC to eliminate, without cause or notice, an economic relationship that Plaintiff was induced to build under materially different terms.

**Position Three — Economic Duress, Pled in the Alternative.** In the further alternative, Plaintiff's continued participation in the TikTok platform under the January 22, 2026 amended Terms of Service was not the product of free and voluntary assent but of economic duress. TikTok USDS Joint Venture LLC leveraged its position as the sole means by which Plaintiff could access the audience and income stream he had already built — an asset TikTok Inc.'s own prior representations had induced him to build — to impose materially adverse new terms with no reasonably available alternative except forfeiture of that already-accumulated value. A reasonably prudent person in Plaintiff's position, facing the choice between accepting the amended terms or losing an established audience and income built over eighteen months in reliance on the platform's prior rules, would have no reasonable alternative but to submit. To the extent this Court finds the amended discretion clause was accepted under economic duress, Plaintiff seeks a declaration that it is voidable

and does not bind him, or in the alternative, that Defendants may not rely on it to excuse or justify any of the conduct alleged in this complaint.

**Position Four — Illusory and Unreviewable "Violation" Standard Governing Account and Content Enforcement.** Independently of Positions One through Three, and against both Defendants as to their respective periods, the "violation" standard invoked to justify every account termination, strike, demonetization, and content removal alleged in this complaint is itself illusory and unconscionable, as alleged in Section III.A above and incorporated here by reference. A contractual condition — "you will not be disciplined absent an actual violation" — that only the disciplining party may ever define, apply, or verify is not a real, ascertainable limitation on that party's discretion; it is unconstrained discretion given the appearance of a rule, and TikTok knows, and has known throughout the relevant period, that no court or jury can compel it to justify any individual enforcement decision because 47 U.S.C. § 230(c)(1) immunizes TikTok from liability for such decisions regardless of their basis. This renders the "violation" standard both illusory under Civil Code § 1550 and procedurally and substantively unconscionable under Civil Code § 1670.5: procedurally, because it was presented to Plaintiff and all creators on a take-it-or-leave-it basis with no opportunity to negotiate a real, externally-verifiable standard; substantively, because it purports to promise protection from arbitrary discipline while delivering none. Plaintiff seeks a declaration that the "violation" standard governing account and content enforcement, as invoked by TikTok Inc. through January 21, 2026, and by TikTok USDS Joint Venture LLC on and after January 22, 2026, is illusory and unconscionable, and that neither Defendant may rely on any purported "violation" determination as a defense to Plaintiff's claims absent an externally verifiable basis for that determination.

Plaintiff seeks a declaration that: (1) the Creator Rewards Contract is illusory and unenforceable, and that TikTok owes Plaintiff the reasonable market value of the benefit received under quasi-contractual principles; or in the alternative, (2) the undisclosed monthly throttle mechanism and the "sole discretion" zero-RPM capability are void and

unenforceable under California Civil Code § 1670.5; (3) the January 22, 2026 amendment to the account and content enforcement discretion standard is unconscionable, voidable for economic duress, or both, as applied to Plaintiff; (4) the "violation" standard governing account and content enforcement throughout the relevant period is illusory and unconscionable, and neither Defendant may rely on any purported "violation" determination as a defense absent an externally verifiable basis; and (5) Defendants may not rely on any of the foregoing provisions as a defense to Plaintiff's claims.

## *V. PRAYER FOR RELIEF*

***WHEREFORE***, Plaintiff Jason Brooks respectfully requests that this Court enter judgment in his favor against Defendants TikTok Inc. and TikTok USDS Joint Venture LLC and grant the following relief:

**A. Compensatory Damages in an amount to be proven at trial, including the following documented and estimated components:**

(1) Permanent audience destruction damages arising from the wrongful termination of @jasontbrooks (19,000 followers) and @jasontbrooks2, estimated at approximately $17,857;

(2) Lost Creator Rewards earnings during the four-month wrongful exclusion from the Creator Rewards Program, estimated at approximately $11,760;

(3) Lost Creator Rewards earnings during the five-month wrongful demonetization period, estimated at approximately $19,950;

(4) Lost Creator Rewards earnings during the March 22-30, 2026, RPM zeroing period, estimated at approximately $2,097;

(5) Lost Creator Rewards earnings during the June 22, 2026, RPM zeroing period, estimated at approximately $6,968.08;

(6) The documented $2,363.32 decline in Creator Rewards earnings from June 2026 ($3,831.92) to July 2026 ($1,468.60), representing an approximately 62% month-over-month collapse in earnings despite the account's continued growth;

(7) Lost Creator Rewards earnings during the July 22, 2026, and ongoing RPM zeroing period, continuing to accrue daily until RPM is restored to a normalized rate, in an amount to be proven at trial;

(8) Per-video RPM suppression losses on specifically documented videos;

(9) Cross-video RPM suppression losses across all affected videos and periods, estimated to exceed $50,000;

(10) Permanent future earnings losses arising from the irreversible destruction of approximately 213,744 followers, estimated at approximately $239,400 on a conservative three-year forward projection basis and approximately $1,596,000 on a perpetuity basis; and

(11) All other compensatory damages flowing from Defendants' wrongful conduct alleged throughout this complaint, in an amount to be proven at trial.

B. Restitution of all advertising revenue retained by Defendants during periods when Plaintiff's RPM was set to $0.00, during the five-month wrongful demonetization period, during the four-month wrongful Creator Rewards Program exclusion period, and across all periods in which Defendants collected advertising CPM revenue on Plaintiff's content while paying Plaintiff less than the fair-market revenue share — pursuant to Plaintiff's unjust enrichment claim (Count IV) and California Business and Professions Code § 17203 (Count VII).

C. Punitive Damages in the specific amount of $6,000,000, reflecting the deliberate, systematic, and egregious nature of Defendants' conduct across more than eighteen months and eleven documented enforcement actions. TikTok's annual U.S. advertising revenue exceeds $10 billion. Beyond the direct financial harm alleged throughout this complaint, Defendants' conduct has subjected Plaintiff to sustained psychological and emotional strain: the knowledge that his account, audience, and livelihood remain perpetually subject to termination under a standard no one but TikTok can ever verify has caused Plaintiff ongoing anxiety and distress, renewed most recently by the four additional strikes issued against @jasontbrook4 between May and July 2026, as alleged in Section III.J above. An

award of $6,000,000 in punitive damages is the minimum necessary to punish TikTok for its deliberate misconduct and deter future repetition of the same conduct against Plaintiff and the millions of other creators subject to the same undisclosed suppression system.

**D. Declaratory Relief declaring that:**

(1) The Creator Rewards Contract is illusory and unenforceable as a matter of California contract law, and that TikTok owes Plaintiff the reasonable market value of the benefit received under quasi-contractual principles; or in the alternative,

(2) The undisclosed monthly RPM throttle mechanism and the "sole discretion" zero-RPM capability are void and unenforceable under California Civil Code § 1670.5, and Defendants may not rely on either provision as a defense to Plaintiff's claims;

(3) The January 22, 2026 amendment to the account and content enforcement discretion standard is unconscionable, voidable for economic duress, or both, as applied to Plaintiff;

(4) The "violation" standard governing account and content enforcement throughout the relevant period is illusory and unconscionable, and neither Defendant may rely on any purported "violation" determination as a defense to Plaintiff's claims absent an externally verifiable basis for that determination;

(5) TikTok's terminations of @jasontbrooks and @jasontbrooks2, September 2025 demonetization of @jasontbrook4, March 22, June 22, and July 22, 2026 RPM zeroing events, Bessent Video removal, and the May-July 2026 four-strike escalation were each wrongful and pretextual, in that each was justified solely by reference to an illusory "violation" standard that TikTok alone defines and no external mechanism can verify; and

(6) TikTok's representations that its content-enforcement decisions are governed by a neutral, violation-based standard are false and misleading unless accompanied by an express disclosure, in TikTok's Terms of Service or Community Guidelines, of whether and to what extent TikTok exercises discretion to suppress content on the

basis of viewpoint, given TikTok's own knowledge that 47 U.S.C. § 230(c)(1) forecloses any external mechanism for testing that representation.

**E. Injunctive Relief requiring Defendants to:**

(1) Immediately restore Plaintiff's RPM on @jasontbrook4 to a rate consistent with Plaintiff's documented pre-suppression earning performance and comparable content performance on the platform;

(2) Disclose to all Creator Rewards Program participants the specific revenue share percentage TikTok pays to creators for Standard Reward RPM;

(3) Disclose to all Creator Rewards Program participants the existence, formula, and operation of any monthly earnings cap or throttle mechanism affecting creator RPM;

(4) Provide no less than thirty (30) days advance written notice to any creator before modifying that creator's RPM rate by more than 25%, as required by TikTok's own Creator Rewards Contract;

(5) Apply content moderation policies and RPM rates on a viewpoint-neutral basis, without differential treatment of political commentary, racial justice content, or criticism of current government officials compared to content expressing opposing viewpoints;

(6) Restore all earnings on successfully appealed videos within one payout cycle as required by TikTok's own Creator Rewards Contract; and

(7) Provide creators with a meaningful human appeal process — with a minimum 72-hour review period before any appeal determination is issued — for all adverse content moderation and account enforcement decisions; and

(8) Include in its Terms of Service or Community Guidelines an express, binding disclosure of whether and to what extent TikTok exercises discretion to restrict, demonetize, or remove creator content on the basis of the viewpoint expressed, rather than representing to creators and the public that content enforcement is governed by an objective, violation-based standard while reserving undisclosed discretion to suppress content by viewpoint.

F. Compensation for Pro Se Litigation Costs pursuant to California Civil Code § 1021.5 (private attorney general doctrine) and the Court's inherent equitable authority.

G. Pre-Judgment and Post-Judgment Interest on all monetary awards at the maximum rate permitted by California law from the date each loss was incurred.

H. Such Other and Further Relief as this Court deems just, proper, and equitable under the circumstances.

## VI. DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Jason Brooks hereby demands a trial by jury on all issues so triable in this action, including: the nature, extent, and duration of Defendants' wrongful conduct; the amount of compensatory damages to be awarded on each count; whether Defendants' conduct was fraudulent, oppressive, or malicious within the meaning of California Civil Code § 3294 so as to warrant an award of punitive damages; the amount of punitive damages to be awarded, which Plaintiff specifically requests in the amount of $6,000,000; the amount of restitution to be awarded; and all other questions of fact properly submitted to a jury.

Plaintiff further requests that this Court empanel a jury at the earliest practicable date consistent with the Court's scheduling orders and the parties' right to adequate trial preparation.

DATED: August 5th, 2026

BY: s/Jason Brooks

***Jason Brooks***
636 Barberry Drive
Longmont, CO 80503
Telephone: (925) 366-0803
E-mail: geniusjasonbrooks@gmail.com
Plaintiff, *pro per*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of August 2026, a true and accurate copy of the foregoing **FIRST AMENDED COMPLAINT FOR: (1) BREACH OF CONTRACT (2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (3) CONVERSION (4) UNJUST ENRICHMENT (5) FRAUD BY OMISSION / CONCEALMENT (6) MISREPRESENTATION AND FALSE ADVERTISING (7) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (BUS. & PROF. CODE § 17200) (8) DECLARATORY AND COMPENSATORY RELIEF — UNCONSCIONABILITY, ILLUSORY CONTRACT, AND ECONOMIC DURESS** was filed through the Central Districts *pro per* EDSS filing system.

s/Jason Brooks ________________

***Jason Brooks***

636 Barberry Drive

Longmont, CO 80503

Telephone: (925) 366-0803

E-mail: geniusjasonbrooks@gmail.com

Plaintiff, *pro per*